# UNITED STATES DISTRICT COURT

<u>NORTHERN</u>  DISTRICT OF  <u>ILLINOIS, EASTERN DIVISION</u>

UNITED STATES OF AMERICA

v.

PHYLLIS MENDENHALL

**FILED**

MAY 2 1 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT.

**MAGISTRATE JUDGE ASHMAN**

CRIMINAL COMPLAINT

CASE NUMBER:

**08CR    404**

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about October 25, 2007, in Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant, Phyllis Mendenhall,

being an agent of the City, corruptly solicited and demanded, and accepted and agreed to accept, things of value, namely, a $200 cash payment, intending to be influenced in her capacity as a City of Chicago building inspector, in a transaction involving a thing of value of $5,000 or more, involving the City, being an agency that received in excess of $10,000 in federal funding in a period from March 29, 2007, to March 28, 2008;

In violation of Title 18, United States Code, Section 666(a)(1)(B).

I further state that I am a Special Agent, Federal Bureau of Investigation, and that this complaint is based on the following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof:   X   Yes   _____ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

May 21, 2008
Date

at  Chicago, Illinois
City and State

Hon. Martin Ashman, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT

I, Tom Simon, being duly sworn under oath, depose and state as follows:

## I.  BACKGROUND OF AFFIANT

1.  I am currently assigned as a Special Agent with the Federal Bureau of Investigation ("FBI"), Chicago Division.  I have been an FBI Special Agent for over 12 years and am assigned to a public corruption squad where I investigate criminal violations by federal, state and local public officials.  During my time as an FBI agent, I have received training and participated in all normal methods of investigation and, including, but not limited to, visual and electronic surveillance, the questioning of witnesses and the use of informants, and undercover operations.  I have also received training in the enforcement of laws concerning, among other things, public corruption and white collar crime.

## II. PURPOSE OF AFFIDAVIT

2.  This affidavit is made for the limited purpose of establishing probable cause in support of a criminal complaint charging PHYLLIS MENDENHALL with violations of Title 18, United States Code, Section 666(a)(1)(B), charging that on or about October 25, 2007, MENDENHALL, being an agent of the City of Chicago, specifically, an employee of the Department of Buildings, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, and series of transactions of the City of Chicago, an agency that received in excess of $10,000 in federal funding in a twelve month period from March 29, 2007, through March 28, 2008, involving anything of value of $5,000 or more.  In particular, MENDENHALL accepted bribe payments in exchange for providing certificates of occupancy in an expedited manner for

properties located at 922 North Oakley Street and 5326-28 South Prairie Avenue in Chicago.

3.  This investigation has been jointly conducted by the City of Chicago Inspector

General's Office, the United States Postal Inspection Service, and the Federal Bureau of

Investigation.  The information contained in this Affidavit is based on my personal

knowledge as well as information obtained from other law enforcement agents participating

in the investigation, cooperating witnesses, documents, and recorded conversations.  Since

this Affidavit is being submitted for the limited purpose of establishing probable cause in

support of a criminal complaint, I have not included each and every fact known to me

concerning this investigation.  I have set forth only the facts that I believe are necessary to

establish probable cause to believe that MENDENHALL committed violations of 18 U.S.C.

666.

## III. EXPLANATION OF THE CERTIFICATE OF OCCUPANCY PROCESS AND CITY DEPARTMENTS

4.  A Certificate of Occupancy (CO) is a document obtained through the Department of

Buildings that indicates that a building conforms to the general, special, and structural

requirements of the City of Chicago Building Code. A CO is required for all new or

remodeled multi-unit buildings consisting of four or more dwelling units, newly constructed

non-residential buildings over 4,000 square feet, alterations or repairs of non-residential

buildings exceeding $400,000 in estimated cost, work in existing buildings resulting in a

change of occupancy, and any work performed in a new or existing building for institutional

assembly use.  The contractor/developer must obtain CO's before the building's dwelling

units are occupied.

5.  There are three basic types of Certificates of Occupancy: Full Occupancy, Advance

or Partial Occupancy, and Temporary Occupancy.  Full Occupancy covers an entire

building; Advance or Partial Occupancy covers a specific, completed portion of a multi-unit building under construction; and Temporary Occupancy is reserved for special events or circumstances in buildings other than residential dwelling units.

6.  In order to obtain a CO, an applicant must submit a Certificate of Occupancy Application with the following information:    address of    project, owner's contact information, contractor's contact information, whether it is a full or partial occupancy request, areas to be inspected, permit numbers and date the permit was issued, and date of completion of work.  The applicant must sign and date the form certifying that the information on the application is correct and all work has been completed in accordance with the approved plans and permits at the time of the scheduled inspections.  After the applicant submits the application, an inspector from each discipline (ventilation, plumbing, new construction, conservation, HVAC, electrical, and zoning) is assigned to conduct a final inspection to ensure that the building conforms to the City of Chicago Building Code.  The assigned inspector will sign off on the permit for final approval of his/her discipline, and a CO is issued to the applicant if all disciplines are up to code.  After the information is entered into the Department of Building's database, the applicant must pick up the CO from the Department of Buildings.

## IV. EXPLANATION OF THE BUILDING PERMIT PROCESS AND CITY DEPARTMENTS

7.  The process for issuing building permits and monitoring construction projects is governed by several departments within the City of Chicago, including the Department of Zoning ("Zoning"), the Department of Construction and Permits ("DCAP"), the Department of Buildings ("Buildings") and the Department of Administrative Hearings ("AH").

8.  The principal role of Zoning is to enforce Chicago's Zoning Ordinance, to implement

the city's land use policies and to maintain and update the city's official zoning maps. Developers seeking to obtain a building permit for new construction and renovation projects which require architecture plans receive an initial review of their architectural plans in Zoning to assure that the project conforms to the official zoning and land use policies of the City of Chicago. Zoning reviews the survey plats, parking lot layouts and site plans to ensure that projects conform to the Zoning Ordinance. When a proposed development is not in compliance with the Zoning Ordinance or permitted use, a developer has the option of seeking an administrative adjustment or a zoning variance. The administrative adjustment process is a streamlined procedure for minor modifications of selected zoning standards. The zoning variance procedures involve review and approval of the requested changes by the Zoning Board of Appeals. Zoning is also responsible for administering the landscape ordinance within the zoning code which governs landscaping of all business, commercial and large residential projects. In addition, zoning is responsible for issuing Certificates of Occupancy (a certificate from the City certifying that a structure is fit for human habitation) for construction projects containing between one to three dwelling units and for issuing Zoning Compliance Certificates (a certificate from the City certifying that a structure meets the applicable zoning requirements) for the occupancy, use, or change of use of any property in the city. Projects receive an initial review in Zoning by a zoning plan examiner ("ZPE"). On-site investigation of projects to ensure compliance with the Zoning Ordinance, including the landscape ordinance, and Certificate of Occupancy reviews are performed by zoning inspectors.

9.  DCAP is responsible for issuing construction permits. Prior to the creation of DCAP in April 2003, construction permits were issued by Buildings. A permit application must

include the names and City license numbers of the general contractor and each subcontractor who intends to work on the construction project. To obtain a general contractor's license from the City, an applicant must mail a license application to an address maintained by the Department of Buildings. License applications must be renewed by mail every year. Generally, the construction permit application process follows one of three different tracks: the Easy Permit Process ("EPP"), Standard Review Plan process, or Developer Services process. EPP is used to obtain construction permits for repair or replacement of existing elements of a building, when no structural changes to the building will be made. Standard Review Plan (also referred to as Open Plan Review) is used to obtain construction permits for small to mid-sized construction and renovation projects requiring architectural drawings. The Standard Review Plan process involves an initial assessment of a construction project by a DCAP project manager. After the project manager review, the architectural plans receive technical reviews of appropriate disciplines which include, among others, electrical, plumbing, ventilation, structural, architectural, landscape and fire prevention. The purpose of each discipline review is to ensure that the proposed project is in conformance with the building codes and regulations of the City of Chicago. The Developer Services process is used to obtain construction permits for large and complex projects. In January 2008, DCAP merged back into the Buildings Department.

10. Buildings is responsible for the enforcement of the Chicago Building Code governing the construction, rehabilitation and maintenance of structures within the City of Chicago. Within Buildings is the New Construction Bureau. New construction inspectors' primary role is to perform inspections to ensure that construction and renovation work conforms to the permits that have been issued by DCAP. Building inspectors can also respond to

complaints regarding structures, including emergencies that occur after working hours, and they can issue violation notices to building owners when a structure is not in conformance with the Building Code. Inspections can also be generated by the public by dialing 311, the non-emergency number for city services. Inspectors can also issue "stop work orders" to stop any construction that is done without a permit, contrary to an approved permit, and other forms of construction that poses a threat to the health and safety of the public. A stop work order is a directive from the Department of Buildings, addressed to the owner of property on which construction or demolition work is proceeding without proper authorization. The stop work order prohibits further work, and in some cases requests the removal of work already completed, until or unless an appropriate construction permit has been obtained. There are different procedures for releasing each kind of stop work order, which can include paying fines and/or paying additional permit fees. Some releases can occur at the City's satellite offices (additional offices located in various neighborhoods for the convenience of property owners and developers), while others involve the applicant presenting the plans and application to the DCAP or to another Department, usually at City Hall. Inspectors sign the back of a contractor's construction permit when an inspection is performed and the inspector determines that the completed work is within the requirements of the Building Code and the scope of the construction permit. Certificates of Occupancy for construction and renovation projects involving four or more units are also issued by Buildings. Building Inspectors conduct inspections of projects prior to the issuance of Certificates of Occupancy. Finally, Buildings has historically maintained a mainframe computer database that contains information about buildings in the City of Chicago, including the number of original units in each building.

11. AH serves as a quasi-judicial tribunal for the expedient, independent and impartial adjudication of municipal ordinance violations. AH has several divisions, including a Building Division. The purpose of the Building Division is to adjudicate cases initiated by the Buildings, Fire and Zoning departments.

12. Contractors, developers, and homeowners may hire a permit expediter to facilitate the construction permit application process. The services performed by a permit expediter include, among other things: completing construction permit application forms; collecting and submitting relevant documents to DCAP and Zoning; waiting in line at City Hall for plan reviews; scheduling building inspections; meeting with architects, contractors, developers, homeowners, City of Chicago inspectors and other City of Chicago officials; resolving building code violations; and obtaining Certificates of Occupancy. City of Chicago employees are prohibited from acting as permit expediters.

13. Obtaining timely reviews, approvals, and permits is important to developers. Waiting for a lengthy period of time for a review, failing to pass an inspection to obtain a permit, or the issuance of a stop work order can have significant financial consequences for developers. These circumstances can preclude developers from starting or completing the work that needs to be done on a project (thereby lengthening the period of time for a project which may add costs or at least delay the time at which a developer can recoup capital tied up in a project), or require developers to do additional work on a project (thereby increasing the cost of the project). For example, as described in detail below, MENDENHALL paid a bribe in exchange for obtaining a favorable inspection related to a Certificate of Occupancy for a property located at 2827 West Congress Parkway. A Certificate of Occupancy, which deems that a building is fit for human habitat, must issue before a building can be occupied.

A Certificate of Occupancy is significant from a financial standpoint for the developer because typically financial institutions will require the Certificate of Occupancy before agreeing to lend money to a buyer for the purchase of the property. Thus, until the Certificate of Occupancy is issued, a developer is unable to sell the property or units in the property and recoup capital put into the project.

## V. THE INVESTIGATION

14. This phase of the criminal investigation began in April 2007, when investigators obtained information concerning a shakedown scheme involving certain individuals, including a particular "expediter," who assisted contractors and developers in the permit application process. Specifically, evidence indicated that a certain building inspector was posting stop work orders on properties and agreeing to lift the order only if the property's owner used this particular expediter. In May 2007, law enforcement agents interviewed the expediter (hereinafter referred to as CW1). [1]

15. CW-1 began cooperating with the government in May 2007. CW-1's cooperation has included conducting consensually recorded calls and meetings, and playing the role of a "bagman" (collecting bribe money from developers and contractors seeking some official act from a City employee or a "priority" handling of a project and paying bribes to City of

---

[1] CW-1 has not been charged with any crime. CW understands that he/she could be charged with a violation of federal criminal law. No promises have been made regarding what charges will be brought and what sentence CW-1 will receive. CW-1 is cooperating with the government in the hopes of receiving a benefit in determining what charges will be brought and what sentence is recommended by the government. CW-1 has no previous arrests or convictions. Investigators believe CW-1 to be reliable. Although CW-1 lied to investigators during the initial interview about the nature and scope of the expediter's relationship with the Buildings inspector and other City employees, CW-1 has subsequently spoken with investigators numerous times under proffer protection, and is believed to have provided truthful information. CW-1 has provided information about bribes activities by over thirty individuals. This information has been corroborated for a number of those individuals by recorded conversations and/or controlled bribe payments.

Chicago employees).[2]

16. CW-1 has advised law enforcement agents that it was the practice of developers and contractors with whom CW-1 has worked to express a willingness to bribe a City official for government actions typically by expressing a desire to do "whatever it takes" to get an action accomplished. CW-1 may inquire from the developer or contractor if CW-1 has a "budget" to work with or if this action is a "priority." CW-1 would then communicate to the City official that an "incentive" is available. In other instances, City officials would solicit bribe payments from CW-1 initially, and CW-1 would then communicate this to the developer or contractor. The developer or contractor would then pay CW-1 for expediting services and the payment would include the amount of any bribes that CW-1 paid to City officials.

17. According to CW-1, developers and contractors will pay bribes to Zoning employees for: a) overlooking violations of the zoning ordinance; b) increasing the reported number of existing dwelling units in a building being rehabbed to avoid a costly and time-consuming zoning variance process; and c) providing a favorable or expedited inspection for a Certificate of Occupancy. CW-1 has admitted to paying bribes to Zoning employees for

---

[2] On June 1, 2007, CW-1 entered into a consent agreement with the USPIS to allow the government to "autorecord" all communications transmitted or received on CW-1's cellular telephone in which CW-1 participated (including voicemail messages left for CW-1). This agreement allowed CW-1 to make and receive calls during the course of this investigation outside the presence of Postal Inspectors and to conduct CW-1's business as an expediter. Under the agreement, CW-1 was not allowed to let anyone other than CW-1 use the cellular telephone and CW-1 was also limited to using the cellular telephone for conducting business as an expediter. All calls were recorded. CW-1 had no control over the autorecord and could not manipulate whether a call was recorded or not. Pursuant to court orders signed approximately every thirty or sixty days, beginning on June 4, 2007 and continuing to March 28, 2008, (with the exception of a period of time in January 2008 during which the autorecord was not renewed) signed by either Chief Judge or Acting Chief Judge, all calls sent or received from CW-1's cellular telephone for a period of thirty or sixty days were recorded using the same technology employed in all Title III wiretaps, but without the requirement of contemporaneous monitoring by law enforcement agents.

these actions.

18. CW-1 has told investigators that developers and contractors will pay bribes to DCAP employees for: a) speeding up the Standard Plan Review process; and b) obtaining quicker review appointments. CW-1 has admitted to paying bribes to certain clerical employees and technical reviewers in DCAP for these actions.

19. CW-1 has told investigators that developers and contractors will pay bribes to Buildings employees for: a) overlooking construction work which does not conform to City building codes; b) overlooking work performed beyond the scope of a building permit; c) removing building code violations; d) lifting stop work orders; e) signing-off on building permits without performing an inspection; f) providing favorable or expedited inspections for a Certificate of Occupancy; and g) changing information in the City's mainframe computer system. CW-1 has admitted to paying bribes to employees in the Buildings department for these actions.

20. CW-1 has told investigators that developers and contractors pay bribes to Administrative Hearings ("AH") employees for a) expediting the AH process and b) negotiating a settlement. CW-1 has admitted to paying bribes to Buildings employees assigned to facilitate adjudication of Buildings cases in AH in a manner favorable to CW-1's clients.

## VI. PROBABLE CAUSE[3]

---

[3] Throughout this Affidavit, I describe various conversations that were consensually recorded. These descriptions often include my understanding of what is being said during such conversations. This understanding and interpretation of the conversations is based on (i) t he contents and context of the conversations, (ii) my experience as a law enforcement officer and the experience of other law enforcement officers in this investigation, including our experience listening to the conversations as a whole, and (iii) the investigation to date, including information obtained from CW-1 and others. All times listed are approximate. The summaries of the recorded conversations set forth in this Affidavit are based on draft-not final-transcriptions. Finally, the

21. According to City of Chicago personnel records, PHYLLIS MENDENHALL has been employed by the City since June 4, 1979 and holds the title of Inquiry Aide III in the Department of Buildings.

### *Historical Bribe Payment Information from CW-1*

22. On May 24, 2007, CW-1 informed law enforcement agents that he/she had passed several cash bribes (usually $100 each) to MENDENHALL in exchange for obtaining expedited certificates of occupancy for various properties in the City of Chicago. CW-1 further informed agents that he/she had been hired to expedite certificates of occupancy for properties located at 922 North Oakley Street and 5326-28 South Prairie Avenue.

### *Controlled Bribe Payments Pertaining to 922 North Oakley Street and 5326-28 South Prairie Avenue*

23. On September 13, 2007, CW-1 placed a consensually recorded telephone call to MENDENHALL. CW-1 left a voice message on MENDENHALL's voicemail. I have reviewed the contents of this message. In summary, CW-1 was calling about the CO for 922 North Oakley being partial occupancy [allowing some units to be lived in] rather than full occupancy [allowing all of the units to be lived in].

24. On September 13, 2007, CW-1 received a consensually recorded telephone call from MENDENHALL. I have reviewed the contents of this conversation. In summary, CW-1 again told MENDENHALL he/she wanted to change 922 Oakley from a full to a partial CO. CW-1 asked MENDENHALL if she can, "you know, change the paperwork, Phyllis?" MENDENHALL told CW-1 that she "can ah, ah pull that [CO] back real fast."

25. On October 24, 2007, CW-1 placed a consensually recorded telephone call to

_____

summaries below do not include all potentially criminal consensually recorded conversations, or all statements or topics covered during the course of conversations.

MENDENHALL. I have reviewed the contents of this conversation. In summary, CW-1 asked if MENDENHALL received a copy of the previously acquired permit for 922 Oakley for the purpose of obtaining a CO. MENDENHALL said that she had not, and CW-1 agreed to resend it to MENDENHALL.

26. On October 24, 2007, CW-1 left a consensually recorded voice message on MENDENHALL'S voicemail. I have reviewed the contents of this message. In summary, CW-1 told MENDENHALL that the owner of 922 North Oakley was faxing over the front and back of the permit to her attention at twelve o'clock.

27. On October 24, 2007 CW-1 placed a consensually recorded telephone call to MENDENHALL. I have reviewed the contents of this conversation. In summary, CW-1 asked MENDENHALL what time she takes lunch. CW-1 told MENDENHALL that he/she wanted to pick up the CO today and the Prairie CO might also be ready later that afternoon.

| | |
|---|---|
| CW-1: | I got your message but it was kind of late, so I didn't wanna get back to you so late, but I wanna pick up that certificate and I wanted to find out what time do you normally go to lunch? |
| PM: | Ahh… |
| CW-1: | 'Cause I don't want to miss you. |
| PM: | Well, from twelve to one. |
| CW-1: | Twelve to one? |
| PM: | Uh-huh. |
| CW-1: | Ok, I'll be there before twelve |
| PM: | Ok then. |

| CW-1: | I'll pick it up and umm… |
|---|---|
| PM: | Ok. |
| CW-1: | One other one might be ready a little bit later on today if he faxes over the signatures. That's for Prairie. |
| PM: | Ok then. |

CW-1 was indicating to MENDENHALL that he/she wanted to see MENDENHALL in person before lunch "cause I don't want to miss you" so that he/she could pay her the bribe for the Oakley and Prairie COs.

28. On October 25, 2007, CW-1 met with agents at the briefing location. An audio recording device was placed on CW-1.[4] Agents provided an envelope to CW-1 containing two $100 bills. CW-1 drove in CW-1's vehicle, followed by agents, to the meeting location, the City of Chicago Department of Buildings located at 120 North Racine Avenue. This meeting was recorded using audio equipment and the agents surveilled the parking lot of 120 North Racine Avenue and monitored the conversation between CW-1 and MENDENHALL using a transmitter. CW-1 paid MENDENHALL $200 cash in two one-hundred-dollar bills for obtaining a partial CO for 922 North Oakley and 5326-28 South Prairie.

| CW-1: | Phyllis, I'm going to leave this paper here. |
|---|---|
| PM: | Oh, ok. |
| CW-1: | It's one and one [$100 and $100], right? |
| PM: | Ok |

Surveillance agents observed CW-1 exit 120 North Racine Avenue and depart the area in CW-1's vehicle. Agents followed CW-1 away from the meeting and met

---

[4]For this and each controlled bribe meeting described in this affidavit, Agents did not search CW1's person or vehicle.

with CW-1 at a briefing location. CW-1 provided agents with a partial CO for 922 North Oakley Avenue that CW-1 received from MENDENHALL. CW-1 told agents that he/she placed the envelope containing the $200 on MENDENHALL'S desk.

29. On October 25, 2007, CW-1 left a consensually recorded voice message on MENDENHALL'S voice mail. I have reviewed the contents of this message. In summary, CW-1 said the owner for Prairie was coming tomorrow at ten to pick up the CO. He would bring the original permit with signatures, and he would ask for MENDENHALL.

30. On February 25, 2008, CW-1 had a consensually recorded conversation with MENDENHALL. I have reviewed the contents of this conversation. In summary, CW-1 asked MENDENHALL to issue the CO for eight units in the Prairie building. CW-1 gave MENDENHALL the permit number and MENDENHALL looked up the information. MENDENHALL told CW-1 that new construction, refrigeration, and ventilation had not yet taken place. MENDENHALL looked up more information regarding ventilation and told CW-1 that it was denied because of "no-entry." CW-1 told MENDENHALL that he/she would be in touch.

31. On March 14, 2008, CW-1 had a consensually recorded telephone conversation with MENDENHALL. I have reviewed the contents of this conversation. In summary, CW-1 inquired about the CO for 5326-28 South Prairie. MENDENHALL told CW-1 to have the owner fax over the back of the permit to her attention. CW-1 asked MENDENHALL to call him/her when it is approved.

32. On March 24, 2008, CW-1 had a consensually recorded telephone conversation with MENDENHALL. In summary, CW-1 asked MENDENHALL if "Vasyl" ever faxed over the permit for 5326 South Prairie, and MENDENHALL replied that he had not. CW-1 told

MENDENHALL that he/she would get in touch with Vasyl and would call MENDENHALL tomorrow.

33. On March 28, 2008, CW-1 left a consensually recorded voice message on CW-1's voice mail. In summary, CW-1 wanted to know if he/she could pick up the CO for full occupancy this morning for 5326-28 South Prairie.

34. On March 28, 2008, CW-1 had a consensually recorded telephone conversation with MENDENHALL. I have reviewed the contents of this conversation. CW-1 asked MENDENHALL if she could obtain a CO for full occupancy, rather than partial occupancy, even though some of the building units did not pass inspection. MENDENHALL agreed to obtain a full CO except for landscaping approval.

CW-1:      I was wondering if New Construction put it in the system and if I could possibly pick up that permit today for the interior for full occupancy.

PM:        He got a certificate, right, for a partial? For units one through three.

CW-1:      Right, we had put in for a full but he, umm, I guess didn't pass on the basement units or something.

PM:        Yah, ahh hah, I'll have it printed up. I'm going to print it up now.

35. On March 28, 2008, CW-1 met with agents at the briefing location. An audio recording device was placed on CW-1. Agents provided an envelope to CW-1 containing one $100 bill. CW-1 drove with agents to the meeting location, the City of Chicago Department of Buildings located at 120 North Racine Avenue. The meeting was recorded

using audio and video equipment, however, due to a malfunction with the video equipment, only the audio was captured. Agents surveilled the parking lot of 120 North Racine Avenue and monitored the conversation between CW-1 and MENDENHALL using a transmitter. CW-1 paid MENDENHALL $100 cash in one one-hundred-dollar bill in MENDENHALL's office for obtaining a full CO excluding landscaping for 5326-28 South Prairie Avenue. The following is an excerpt of the conversation between CW1 and Mendenhall:

| | |
|---|---|
| PM: | Ok, there you go. |
| CW-1: | Oh, this is Prairie. |
| PM: | Ah hah. I made you an extra copy, ok. |
| CW-1: | Ok, thanks Phyllis. |
| PM: | All right then. |
| CW-1: | And umm, this is one from him, ok? |
| PM: | Oh, ok |

CW-1 entered the agent's vehicle and drove from the area to meet at a briefing location. CW-1 provided agents with a full CO for 5326-28 South Prairie Avenue. CW-1 told agents that he/she placed the envelope containing the $100 bill on MENDENHALL'S desk.

36. Investigators obtained information from two confidential sources who are both professionals in the marketing and sales of new construction and condominium rehabilitations in Chicago with fourteen years of experience. The sources informed investigators that the typical range of profit margin for a developer on the sale of a project that is a multi-unit condominium rehabilitation or new construction condominium building located in Chicago is at least 20%. The range of the profit can vary based upon variables

including the original cost of the land, construction costs, and time on the market before sale. One of the sources, who is familiar with the underlying financing of such projects, informed investigators that lenders generally require that the developer establish a minimum of a 20% profit cushion before the lender will finance the project. Based upon a review of publicly available information, the Prairie property is an eight unit condominium conversion, and four units have already been sold. Each unit is priced at $175,000 - $220,000. The Oakley property is a 15 unit condominium conversion. The garden (basement) unit is on sale for $229,000.

37. A review of City of Chicago records and the City's web site   disclosed that the City of Chicago is a unit of local government that received in excess of $10,000 in federal funding in a twelve month period from December 1, 2006 through December 1, 2007.

## VII.    EVIDENCE BASED ON CONVERSATIONS INTERCEPTED ON T-3

38. Federal agents obtained authority from Chief Judge James F. Holderman to intercept conversations over the cellular telephone (Target Phone 1") and office telephone (Target Phone 3") used by Beny Garneata, a contractor and real estate developer. The interception began on October 4, 2007, and ended on December 28, 2007. Summaries of certain intercepted conversations are set forth throughout this affidavit, and they reveal the corrupt nature of the relationship of Garneata, MENDENHALL, and others, specifically, a continuing course of bribe payments in exchange for favorable treatment between Garneata and MENDENHALL pertaining to certificates of occupancy for Garneata properties.

39. On October 9, 2007, at 3:39 p.m., Beny Garneata had a conversation with an unidentified male. In summary, Garneata told the unidentified male that MENDENHALL was not in the office today and had been off since Friday. Garneata further stated that he

spoke with a named individual (a City of Chicago Department of Buildings employee) who stated, "nobody gets anything done unless this lady is here."

40. On October 10, 2007, at 7:25 a.m., Garneata had a conversation with MENDENHALL. In summary, Garneata told MENDENHALL that he/she called her a few times yesterday. MENDENHALL said that she was off Friday. MENDENHALL told Garneata that she thought it was her "special man" calling her and Garneata stated the he is "always special for her." Garneata said he needs 6240 South Troy, and MENDENHALL told him that he needed to talk to "his man." Garneata asked MENDENHALL which department, and MENDENHALL said "Mac Milam," a ventilation inspector. MENDENHALL further stated that it was the only inspection that has not been turned in on the project. Garneata said he would check with Milam and would call MENDENHALL back.

41. On October 19, 2007, at 3:23 p.m., Garneata had a conversation with MENDENHALL. In summary, MENDENHALL said that Ron Piekarz, an architect who works for Garneata, came in to pick up "that certificate." MENDENHALL told Garneata that boilers had to come out on Monday, and she wanted to make sure Garneata would have someone there for them to inspect the boilers.

42. On October 20, 2007, at 10:37 a.m., Garneata had a conversation with Piekarz. In summary, Garneata stated that she (believed to be MENDENHALL) called Garneata yesterday around 3:00 and told Garneata to tell Piekarz that the boiler guy is coming over to sign off. Garneata told Piekarz that she (believed to be MENDENHALL) gave that (believed to be a CO) to Piekarz because of Garneata and because Garneata is a "hot stud."

43. On October 23, 2007, at 11:59 a.m., Garneata had a conversation with

MENDENHALL. In summary, Garneata stated that he is returning MENDENHALL'S call from earlier. MENDENHALL explained the problems with a building inspection at "the 63 unit building" (believed, based on other evidence, to be the South Loop Hotel). MENDENHALL explained that there are problems with inspectors not fully signing off on the first floor and the inspectors were going to have to go back. MENDENHALL explained that the only disciplines that signed off were new construction, refrigeration, and ventilation. MENDENHALL explained to Garneata that he needed to talk with electrical, and told Garneata that things would work out.

44. On October 23, 2007, at 12:22 p.m., Garneata left MENDENHALL a voice message. In summary, Garneata stated that he spoke with someone in the electrical department who took care of things [for the South Loop Hotel] and it would be put in the system as a final [Certificate of Occupancy]. Garneata asked MENDENHALL to call him if there are any other problems that need to be addressed.

45. On October 23, 2007, at 2:15 p.m., Garneata had a conversation with MENDENHALL. In summary, MENDENHALL told Garneata that she typed up a certificate for 63 units excluding landscaping and a separate certificate for 63 units excluding pool, retail, and basketball court. Garneata said that is exactly what he and Piekarz wanted from day one. MENDENHALL explained to Garneata that when these guys (believed to be building inspectors) gave her certain things, she had to type what she saw. Garneata thanked MENDENHALL and tells her that Piekarz will be there at 3 to pick up the certificates.

46. On October 31, 2007, investigating agents conducted a surveillance of the Buildings Department located a 120 North Racine Avenue. During the course of the surveillance, agents observed and videotaped Garneata arrive and enter the Buildings Department. Agents

also observed Garneata leave the Buildings Department with an envelope.

47. On November 21, 2007, at 12:47 p.m., Garneata had a conversation with Piekarz. In summary, Garneata told Piekarz he should have the CO by Friday (believed to be for the South Loop Hotel). Piekarz said that the boiler inspector was there and signed off on the back of the permit and when Piekarz got back to the office, he would fax it to MENDENHALL. Garneata said that MENDENHALL already took care of it and went over to boilers and got everything that she needed. Garneata said that he was waiting for Zoning and Fire to send over the paperwork to MENDENHALL.

48. On November 26, 2007, at 1:03 p.m., Garneata had a conversation with Piekarz. In summary, Garneata told Piekarz that MENDENHALL asked Garneata to get her tickets to a sports event, believed to be a Bears football game for her and Milam and their spouses.

Piekarz: And if you talk to our girlfriend, let me know about (unintelligible).

Garneata: Oh, oh, good thing you reminded me. Guess what she asked me for?

Piekarz: What?

Garneata: If I can get her tickets for Sunday's game. Her and Mac and their husbands and wives.

Piekarz: Wow, yeah.

Garneata: Man, I said I don't know. I don't want to promise you.

Piekarz: Yah, don't…

Garneata: I will do my best.

| | |
|---|---|
| Piekarz | Yeah, don't promise. They may all be gone already. But let me see what I can do. |
| Garneata: | See what you can do. That would be nice, nice for her to go. Man, that would make her happy. |
| Piekarz: | Okay, we'll see what we can do but if they're gone then (unintelligible) I'll check it out. |
| Garneata: | Yeah, check it out. I almost forgot about it. She… |
| Piekarz: | Yeah, ok. |
| Garneata: | Yeah, she, she said she'll have your, she should have my CO in the next day or two. |
| Piekarz: | Okay, sounds good |

49. On November 28, 2007, at 7:56 a.m., Garneata had a conversation with Piekarz. In summary, Garneata told Piekarz not to worry about it (believed "it" to be getting tickets for the game) because they (believed to be MENDENHALL or Milam) had a death in the family. Garneata asked Piekarz to get tickets for next month, and Piekarz said that he would try to get something for basketball. Piekarz said that he faxed that stuff over to her (believed to be MENDENHALL) yesterday. Piekarz said the first thing he needed to do was take care of the occupancy issues (believed to be for the South Loop Hotel) and told Garneata to call him when he hears anything from MENDENHALL.

50. On November 28, 2007, at 9:00 a.m., Garneata had a conversation with MENDENHALL. In summary, MENDENHALL stated that she spoke with a named inspector in the Fire Department, and the named individual sent MENDENHALL a bunch

of releases but the 26th Street (South Loop Hotel) was not on there. MENDENHALL also

stated that she had not heard anything from a certain zoning inspector regarding the Western

Avenue property. MENDENHALL told Garneata that she would not be at the office the rest

of the week, and Garneata said that he wanted to get it done before she left.

51. On November 28, 2007, at 1:29 p.m., Garneata left a voice message for a particular

zoning inspector. In summary, Garneata was initially talking to someone in the background

stating that MENDENHALL wanted to give him a CO and he was the one who had to

struggle for it. Garneata then left a message saying that MENDENHALL is going out of

town and Garneata needs the zoning inspector's help to get the zoning approval so he can

obtain the CO for 11 West 26th Street. Garneata stated that MENDENHALL had been

unable to get in touch with anyone from Zoning and asked the zoning inspector to call him

back so it could be taken care of before MENDENHALL left.

52. On November 28, 2007, at 2:37 p.m., Garneata had a conversation with

MENDENHALL. In summary, MENDENHALL informed Garneata that she was typing up

his CO and Garneata could pick up the CO before 4:00 p.m. Garneata ended the call by

telling MENDENHALL that she was "the best."

53. On November 29, 2007, at 8:45 a.m., Garneata had a conversation with Piekarz. In

summary, Piekarz said in code that he picked up the CO from MENDENHALL for the South

Loop Hotel.

> Piekarz:          Oh man, the eagle landed yesterday, man. I got, ahh, went in
>
>                   there, you know. She handled us with kid gloves. She, she
>
>                   said, she said to tell Beny G. to settle down, God has the
>
>                   power.

| Garneata: | (laughs) |
|---|---|
| Piekarz: | She did man, she said, you know she goes well this is gonna he, this is gonna, you know she goes, man. I walked in and she goes, he sent you? And I said yah, I'm the sacrificial lamb. |

54. On December 14, 2007, at 8:42 a.m., Garneata had a conversation with MENDENHALL. In summary, Garneata inquired about a property on Western Avenue, and MENDENHALL informed Garneata that she has not received anything yet. Garneata asked MENDENHALL to contact a named zoning inspector. Garneata told MENDENHALL that he was going to send Santa to see her next week.

| MENDENHALL: | ... Was that the only thing that you were looking for today? |
|---|---|
| Garneata: | That's it and I'll be sending Santa to see you next week. |
| MENDENHALL: | Okay, Beny. |

55. On December 14, 2007, at 10:32 a.m., Garneata left a voice message with Piekarz. In summary, Garneata asked Piekarz to call MENDENHALL with the address on Western and explained that MENDENHALL was trying to get the COs done today. Garneata further stated that MENDENHALL talked to a particular zoning inspector, and everything was taken care of.

56. On December 18, 2007, at 2:12 p.m., Garneata had a conversation with Piekarz. In summary, Garneata asked Piekarz if a named individual took care of the thing that Piekarz wanted done and they joked about MENDENHALL.

| Garneata: | Did ahh, (named individual) take care of the things that you |
|---|---|

needed done?

Piekarz:        He's tryin'. He's gonna have to go back down to City Hall to

                umm, he's he's goin' back down to City Hall to get a permit

                you know. He's he's getting his introduction to City Hall.

Garneata:       I know, he's not like Beny. Takes a while.

Piekarz:        Well, you know. He doesn't go down there and rub up in the

                inside of her thigh to make her happy and then it's all good.

Garneata:       Of course, of course.

Piekarz:        (Laughs) You know what I mean?

Garneata:       Of course .

57. On December 24, 2007, at 8:50 a.m., Garneata had a conversation with
MENDENHALL. In summary, Garneata told MENDENHALL that he was going to stop
by and bring her and a Licensing employee "something" (believed to be a bribe payment):

MENDENHALL: Are you working hard?

Garneata:       Yes, I'm going to be stopping by to bring you something.

MENDENHALL: Well you know… You know, we can't, you know we can't

                accept anything now.

Garneata:       Pardon?

MENDENHALL: We can't accept anything. You know the, we got new rules.

Garneata:       Yah, I heard

MENDENHALL: Okay, all right well. What time you'll be by?

Garneata:        I'll just see Mac. I'll just see Mac, okay?

MENDENHALL: Oh, you'll see, no, no, no. I mean

Garneata:        You want me to see you? (Laughs) Okay

MENDENHALL:  Yah

Garneata:        Okay

MENDENHALL: Yah, yah, just.

Garneata:        But then I'll have to meet you outside, not over there because I don't wanna be seen.

MENDENHALL: Oh, okay then.

Garneata:        And what's the lady's, and what was that lady's name, something about the one that took care of me?

MENDENHALL: The what now?

Garneata:        From the licensing, what was her name?

MENDENHALL: License, you talking about (a named individual), for ah

Garneata:        Yah

MENDENHALL: placard card?

Garneata:        No, remember when she took care of the licensing

MENDENHALL: Oh, ahh

Garneata:         for me for plumbing

MENDENHALL: Yeah, Alex, Alex.

Garneata:        Alex? Okay, I have something for her too, okay?

MENDENHALL: Okay, well, give me a call.

Garneata:        I'll call you at this number, okay?

MENDENHALL: All right.

58. On December 24, 2007, at 10:25 a.m., Garneata had a conversation with MENDENHALL. In summary, Garneata told MENDENHALL he would meet her in front of Oprah's place because he doesn't want to walk into the building with the envelopes.

Garneata:        How's our beautiful lady doing?

MENDENHALL: I'm doing good sweetie, how are you?

Garneata:        Oh, where can I see you because I don't wanna walk in there with envelopes and they're gonna look at me like, ohh, this guys here.

MENDENHALL: Okay, all right. Well I gotta (unintelligible) car, umm. You know what, I gotta run down to Chase to get some money out, out the bank so right now–

Garneata:        I can meet you there. Where–

MENDENHALL: Okay.

Garneata:        Where's Chase?

MENDENHALL: It's on umm, Wash, Washington. Washington.

Garneata:        Washington?

MENDENHALL: Yah, about ahh, four, maybe four, four, five blocks from ahh.

You know where Oprah's place is, right?

Garneata:          Yah,

MENDENHALL: Wishbone? Okay

Garneata:          Okay, I'll just meet you, I'll meet you in front of Oprah's

place on Washington.  I'm, I'm in a, a black  ah–

MENDENHALL: A what now?

Garneata:          SUV.  I'll be in front of ahh, Oprah place.

MENDENHALL: Okay. All right, all right baby I'll see later.

Garneata:          I'm in a black, black ah ah, SUV ah Volkswagen.

59. On December 24, 2007, at 10:35 a.m., Garneata had a conversation with a City of Chicago Department of Buildings employee.  In summary, Garneata told the above named individual that he met up with MENDENHALL and gave her the above named individual's envelope and others.

Garneata :          I met up with Phyllis and I gave her your envelope, too and

Mac's and some other people so she's gonna give it to you,

okay? A beautiful lady.

Buildings employee:(Unintelligible) already?

Garneata:          Beautiful Phyllis.

60. Based on the facts described above, I submit that there is probable cause to believe that PHYLLIS MENDENHALL, being an agent of the City, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept things of value

of $5,000 or more, intending to be influenced or rewarded in connection with any business,

transaction, and series of transactions involving the City of Chicago, being an agency that

received in excess of $10,000 in federal funding in a twelve-month period from March 29,

2007, through March 28, 2008, in violation of Title 18, United States Code, Section

666(a)(1)(B).


Tom Simon

Special Agent, Federal Bureau of
Investigation


Subscribed and sworn to me this
21st day of May, 2008:


Martin C. Ashman
U.S. Magistrate Judge